IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America | ) | Criminal No.: 2:04-952 |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael Moore, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on defendant's motion to suppress evidence seized

from the premises located at 1285 Falling Water Lane and 14 Hynes Street, both in

Sumter, South Carolina.  At a hearing on April 11, 2005, this court heard arguments on

the issue and denied defendant's motion; the court now issues this order setting forth the

reasons for its ruling.

## I.  Facts

The two searches in question were executed pursuant to federal search warrants

issued by United States Magistrate Judge Joseph R. McCrorey.  On September 27, 2002,

DEA Special Agent Steve Parkinson ("Parkinson") prepared affidavits in support of

applications for the warrants that ultimately issued.  Both of Parkinson's affidavits set

forth essentially the same information regarding 1) Parkinson's experience with drug

traffickers, 2) the patterns of behavior Parkinson has observed in such traffickers, and 3)

Parkinson's ongoing investigation of defendant Michael Moore ("defendant" or

"Moore").

Parkinson had a combined nine years of experience dealing with large-scale

narcotics investigations.  In that time, he observed that participants in these large-

quantity drug trafficking and money laundering operations often held assets in other

persons' names in order to conceal their wealth.  He observed that these type traffickers

often needed ready access to large amounts of cash, that their operations frequently

spanned many years, and that they have to maintain some type of records in order to keep

track of payments and debts because, among other reasons, they sometimes allowed their

customers to sell drugs on consignment.  He further observed that these records usually

included information on drug movement and customer contacts and therefore also had to

be readily accessible.  As a result, these type records were often kept in places such as

homes, businesses, cars, safes, or safe deposit boxes.

Parkinson stated that traffickers often used false identification and fictitious

names to hide money and therefore often needed records of those names and hiding

places.  He stated that they often used delivery services and therefore needed records and

receipts of those deliveries.  Parkinson discussed how traffickers used businesses to

launder money and how there were usually records of that activity.  In short, Parkinson

described a variety of business records and paper trails that are often tools of complex

drug trafficking and money laundering operations.

Next, Parkinson described his investigation of defendant up to that point in time.

He recounted admissions from a confidential source that claimed to have bought various

amounts of drugs from defendant dating back to 1992, including at least one occasion on

consignment.  The same source also stated that defendant's drug operation involved

transport to and from Florida by paid carriers and often entailed defendant breaking down

spare tires and filling them with drugs or money.  Parkinson knew of a corroborating

traffic stop in April of 2000 involving over $77,000 in cash hidden in the spare tire of a

vehicle registered to defendant and linked to the Falling Water Lane address.

Parkinson described how, in September of 2001, the Sumter Police Department received information that defendant would be delivering a quantity of drugs to Rimini, South Carolina. He recounted observations of law enforcement officers that conducted surveillance and witnessed what seemed to be the transfer of a large amount of drugs involving defendant.

Parkinson recounted the statements of another confidential source who had observed large amounts of cash in defendant's home, who claimed that defendant's businesses were not legitimate, and who was with defendant in Florida when he purchased cocaine. Parkinson described yet another confidential source who met defendant at 1285 Falling Water Lane and picked up a kilogram of cocaine sometime in 2000. This same source claimed to have met defendant at the Hynes Street address to pick up another kilogram of cocaine. Parkinson described still another tip received by the Sumter County Sheriff's Office on September 17, 2002 describing defendant as a drug dealer and claiming that he used the Hynes Street address as a "stash house" for large quantities of drugs and money even though no one actually lived there. This source also informed law enforcement that defendant was scheduled to go to Florida the week of September 20, 2002 to pick up a shipment of drugs to bring back to Sumter. Parkinson continued that defendant was the record owner of the Falling Water house and a relative of defendant's was the registered owner of the Hynes Street house. Parkinson also reported on records of credit cards linking defendant to Florida hotels and showing that defendant rented large SUV's that were driven the same distance as that between Florida

and South Carolina.

As a result of the above information, the government sought and received warrants for the houses located at 1285 Falling Water Lane and 14 Hynes Street, both in Sumter, South Carolina, to search for books, receipts, ledgers and other types of records indicative of drug trafficking and money laundering and consistent with the scheme described in the affidavits.  Neither the affidavits nor the warrants mentioned any search for actual narcotics.  The government executed the search warrants before they expired on October 7, 2002, and recovered 1) $84,000 in cash, money bags, money wrappers, mortgage statements, and bank statements from Falling Water Lane and 2) a tire changer and manual, a computer list with phone numbers, hotel records, hotel bills, car rental agreements, a cellular phone, and lease agreements from Hynes Street.[1]  Defendant sought to keep these items out of evidence as seized in violation of his Fourth Amendment rights.  For the following reasons, this court denied defendant's motion to suppress the evidence.

## II.  Analysis

Defendant argued that, in spite of the warrants authorizing the searches, the evidence was seized in violation of his Fourth Amendment rights because the affidavits behind the warrants were "devoid of information that would support a probable cause determination making any belief that probable cause exist[ed] completely unreasonable."

---

[1] There was a subsequent search of Hynes Street in 2004 that resulted in the seizure of additional evidence and that also made up part of defendant's motion, but as that matter was dispensed with in open court, this order only deals with the 2002 searches of Falling Water Lane and Hynes Street.

(Def.'s Mot. to Suppress at 4.)  At oral argument, defendant expanded on that idea by explaining that the affidavits were too general and that the information they contained was too old to support probable cause.  The government responded that, based on the nature of the offenses involved and the type of evidence sought in the warrants, the affidavits provided a sufficient basis for a finding of probable cause.  The government argued, in the alternative, that the good faith exception set out by the Supreme Court in United States v. Leon, 468 U.S. 897, 926 (1984), should work to keep the seized items in evidence.

### A.    The warrants

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer."  California v. Carney, 471 U.S. 386, 390 (1985).  Violations of the Fourth Amendment can lead to the suppression of evidence obtained by the illegal search under the exclusionary rule established by the United States Supreme Court in Weeks v. United States, 232 U.S. 383 (1914), whereby evidence obtained in violation of the Fourth Amendment proscription of unreasonable searches and seizures may not be used against an accused.

As the searches in question were conducted pursuant to warrants, the appropriate inquiry is the sufficiency of the warrants; and although probable cause is a question of law, the issuing magistrate judge's determination is entitled to great deference from this court.  United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004) (citing United States v.

Wilhelm, 80 F.3d 116, 118-19 (4th Cir. 1996)).  In fact, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  Id. (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (alterations in original)).

The government relies heavily on United States v. Farmer, 370 F.3d 435 (4th Cir. 2004), for its argument that the affidavits before the magistrate judge provided him with a substantial basis to conclude that probable cause existed.  In Farmer, the defendant was suspected of a large-scale counterfeit clothing and money laundering operation.  Id. at 436.  Law enforcement officers obtained information from two indicted individuals that the defendant had purchased more than a half-million dollars worth of counterfeit clothing from them between January 2 and May 18, 1997, the last payment having been made to them on June 14, 1997.  Id. at 437.  The two sources identified the hotel that was the normal location of the transactions and identified a warehouse that had also served as a drop-off point.  Id.  Documents produced in the civil discovery of an unrelated case later showed that the owner of the warehouse had purchased counterfeit goods from defendant in 1996, and a subsequent review of phone records confirmed that the number used by the two sources to contact the defendant was linked to a location listed as his residence.  Id.  Additionally, October 1997 phone records showed calls from the defendant to one of the sources of the affidavit and to a company that embroidered logos onto the counterfeit clothing for the defendant.  Id. at 437-38.  Based on all of that information, law enforcement officers obtained a search warrant for the defendant's residence in July 1998.  Farmer, 370 F.3d at 438.

6

In response to the defendant's staleness argument, which he based on the nine

month gap between the time frame established by the incriminating information

possessed by law enforcement and the date of the search, the Fourth Circuit stated that

the "ongoing nature of [the defendant's] counterfeit clothing operation rendered the

recency of the information in [the law enforcement officer's] affidavit less crucial, and

'suggested that probable cause [was] not diminished solely by the passage of time.'"  Id.

at 439 (citing United States v. McCall, 740 F.2d 1331,1336 (4th Cir. 1984) and United

States v. Rhynes, 196 F.3d 207, 234 (4th Cir. 1999)).  The court observed that the large-

scale counterfeiting operation had continued for "quite some time" and was "unlikely to

have been suddenly abandoned."  Id.  Furthermore, it found that to suppose that a

"successful and profitable criminal enterprise simply faded away for no apparent reason"

would "defy common sense."  Id. at 440.  In addition, the Fourth Circuit found it

significant that the objects to be seized based on the warrant were "the types of records

that 'are not ordinarily destroyed or moved about from one place to another.'"  Id.; see

also Rynes, 206 F.3d at 374-76 (where the Fourth Circuit observed that a warrant was not

stale where a drug trafficking and money laundering scheme spanned more than two

decades and there was no reason to think that records of such a long-standing operation

had been destroyed).

The court agrees that Farmer controls the instant case.  Here, just as in Farmer,

law enforcement officers had the statements from other criminal suspects who described

a longstanding and ongoing drug trafficking and money laundering operation, dating

back to 1992.  Also, just as law enforcement corroborated the statements in Farmer with

7

phone records and information from civil discovery, law enforcement in the instant case

corroborated the statements of the present confidential sources with: 1) the facts of the

April 2000 traffic stop, i.e., the car owned by defendant but driven by someone else and

containing over $77,000 in cash hidden in the spare tire; 2) the Florida hotel and credit

card receipts; 3) the SUV rentals with mileage corresponding to that between Florida and

South Carolina; and 4) the surveillance of actual drug transactions involving defendant.

Additionally, the statements of the sources in the present case were internally consistent.

One source saw large amounts of cash in defendant's home– consistent with the

statement from another source that defendant was sending large amounts of cash to

Florida; several sources reported buying drugs from defendant; one source described

defendant's method of using spare tires to smuggle drugs and money while another

source overheard defendant talking about breaking down tires during a separate drug

transaction.  Several sources described defendant's connection to Florida and his

preference for getting drugs from there.

In short, the affidavits show drug traffickers' tendency to need records where

they conduct extensive operations.  They show evidence that defendant conducted

extensive drug trafficking operations for more than a decade and that he did so out of the

two Sumter addresses.  The affidavits show a connection to the Hynes Street address in

that one source described it as defendant's "stash house" while another claimed to have

actually bought drugs there.  The affidavits show a connection to the Falling Water Lane

address in that defendant actually lived there, it was the address linked to the vehicle

transporting cash, large amounts of cash were seen there, and sources claimed to have

conducted drug transactions there.  The most recent source informed law enforcement on

September 17, 2002 that defendant was scheduled to pick up a shipment of cocaine the

week of September 20, 2002, and bring it back to Sumter.  These links, combined with

the business record nature of the evidence sought– useful to drug traffickers and money

launderers only if readily available and rarely moved or destroyed– gave the magistrate

judge a substantial basis to conclude that probable cause existed that records like those

described in the warrants would be present at the two addresses at the time of their

execution on October 7, 2002.

### B.     Good faith

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court held that

evidence obtained by "officers reasonably relying on a warrant issued by a detached and

neutral magistrate" is admissible.  Id. at 913.  However, this good-faith exception does

not apply in four situations: 1) when the warrant is based on an affidavit containing

"knowing or reckless falsity"; 2) when the magistrate has simply acted as a "rubber

stamp" for the police; 3) when the affidavit does not "provide the magistrate with a

substantial basis for determining the existence of probable cause"; and 4) when the

warrant is so "facially deficient" that an officer could not reasonably rely on it.  United

States v. Wilhelm, 80 F.3d 116, 121 (4th Cir. 1996) (citing Leon, 468 U.S. at 923).

Defendant contends that the third exception to Leon is applicable to the present case and

therefore that Leon cannot save the searches in question.  For the same reasons as those

laid out above, the court finds that the affidavits did provide the magistrate judge with a

substantial basis for determining probable cause.  As a result, the court finds that the

officers in this case reasonably relied on the warrants issued by the magistrate judge and

that <u>Leon</u> provides another basis for the admissibility of the evidence in question.

### III.  Conclusion

It is therefore, **ORDERED**, for the foregoing reasons, that defendant's motion to

suppress is **DENIED**.

**AND IT IS SO ORDERED.**


s/ David C. Norton

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**


**April 21, 2005**
**Charleston, South Carolina**